Troy LONG and John A. Thompson, Conservators of Taylor Thompson, a Minor, Plaintiffs–Respondents,

v.

MISSOURI DELTA MEDICAL CENTER, Defendant–Appellant.

No. 22927.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 13, 2000.

Petition for Rehearing and Transfer Denied Dec. 5, 2000.

Application for Transfer Denied Jan. 23, 2001.

James J. Hennelly, Matthew J. Fairless, and Karen Carr Moske of Hazelwood & Weber, L.L.C., of St. Charles, MO, for Appellant.

Maurice B. Graham and Morry S. Cole, of The Graham Law Firm, of St. Louis, Mo., and John Heisserer, of Dickerson, Rice, Speth, Heisserer & Summers, of Cape Girardeau, MO, for Respondents.

JAMES K. PREWITT, Judge.

Plaintiffs allege that the negligence of Defendant and a previous defendant, David Carr, a medical physician, caused Taylor Thompson to have cerebral palsy. Shortly before the trial, Dr. Carr reached a settlement with the Plaintiffs for $950,000.00. After a jury trial, a verdict was received assessing fifty-seven percent of the fault for Taylor Thompson's damages due to Dr. Carr, and forty-three percent due to negligence of a nursing employee of Defendant. The jury found damages of $5,212,455.00. Judgment was then entered against Missouri Delta Medical Center ("MDMC"), the remaining defendant, totaling $2,241,355.65. The future damages were to be paid in installments over ten years. After the trial court denied Defendant's "Motion for Judgment Notwithstanding the Verdict, Motion for a New Trial, and, in the Alternative, for Remittitur," MDMC appealed, presenting eleven points relied on.[1]

## I. FACTS AND RELATED PROCEEDINGS

Taylor Elizabeth Thompson ("Taylor") was born on October 1, 1996 at the Missouri Delta Medical Center in Sikeston, Missouri. Due to complications during labor and following an attempted vaginal delivery, an emergency cesarean section was performed. At birth, she suffered from "meconium aspiration syndrome" and "bradycardia/birth asphyxia." These conditions caused Taylor to suffer from "spastic quadriplegia related to encephalomalacia resulting from perinatal hypoxia and ischemia," or cerebral palsy. Taylor's disability was pronounced; she was sightless, speechless, deaf, and unable to control her limbs or swallow. This action initially sought damages from Missouri Delta Medical Center ("MDMC") and David A. Carr, M.D. for malpractice, alleging that Taylor's condition resulted from the actions of Dr. Carr and Nurse Cathy McDonald, an employee of MDMC, in the October 1, 1996 delivery of Taylor Thompson. The events that form the basis for Plaintiffs' complaint follow.[2]

Elizabeth Long, Taylor's mother, was admitted to the hospital at approximately 5:00 p.m. on September 30, 1996, after a routine office examination that morning showed that her cervix was dilated at one centimeter and an ultrasound performed during the examination showed the baby was eight and one-half to nine pounds in

---

1. Defendant MDMC filed a notice of appeal on April 5, 1999. On October 27, 1999, Taylor Thompson died. As part of MDMC's appeal, MDMC is requesting that the court "judicially note the death of Taylor Thompson and order reduction in the future medical expenses portion of the judgment pursuant to § 538.220.5," RSMo 1994, or order the trial court on remand to do the same.

2. The record shows Ms. McDonald's name spelled as both "MacDonald" and "McDonald", we are using only "McDonald" for the sake of consistency.

size. At the hospital, Cervioil was placed on her cervix to induce labor. She was administered fluids intravenously and was administered oxygen by mask. Her water broke at approximately 4:00 a.m., at which point she was dilated to five centimeters. By 8:20 a.m., on October 1, 1996, Ms. Long was fully dilated and expressed the urge to push, and Dr. Carr ordered her to do so. Dr. Carr also ordered that Ms. Long continue to be administered five liters of oxygen per minute, but the strap for the oxygen mask was never placed around her head. Ms. Long apparently removed the mask several times, and her mother and a friend who were with her would try to put it back on her. Ms. Long stated that "[t]hey kept trying to put the oxygen mask on. Every time it felt like it was shutting off my air. . . . I could get more air without it on."

Dr. Carr examined Ms. Long on October 1, 1996, at 8:02, 8:12, and 8:25 a.m. After Dr. Carr left at 8:25 a.m., Nurse McDonald remained in the room. She was the only individual providing care to Ms. Long between 8:28 a.m. and 8:37 a.m. During that time, Nurse McDonald marked the fetal monitor strip to indicate nursing interventions. She did not make any entries on Ms. Long's charts during this time period because the chart was at the nurse's station and she did not want to leave the patient to retrieve it. Instead, she waited until after the delivery was complete.

At 8:28 a.m., Taylor's heart rate dropped to a "non-reassuring" level. Nurse McDonald contends that markings she made on the fetal monitor strip show that she performed nursing interventions at 8:29 a.m. and 8:37 a.m., which would indicate that she turned Ms. Long onto her side; however, Nurse McDonald only remembers elevating Ms. Long's hip. Nurse McDonald never told Ms. Long to stop pushing. Nurse McDonald did not make sure Ms. Long was wearing her oxygen mask,

even though she acknowledged that it was her responsibility to do so. Although Nurse McDonald was permitted under Dr. Carr's orders to increase the amount of oxygen to six to eight liters per minute for "fetal compromise," she did not. At 8:37 a.m., there was a rise in Taylor's fetal heart rate, which continued to rise until approximately 8:51 a.m.

There is a dispute over what time Nurse McDonald went to find Dr. Carr, but it apparently was between 8:37 a.m. and 8:45 a.m. Nurse McDonald says she left her patient only for the amount of time it would take for her to walk from the patient's room to the nurse's station at the end of the hall to get Dr. Carr and return, a couple of minutes at the most. Dr. Carr accompanied her back to the room and looked at the fetal monitoring strip, after which, at 8:45 a.m., Nurse McDonald noted that Dr. Carr was present in the delivery room ("Dr. Carr here"). From the point that Dr. Carr entered the room (8:45 a.m. at the latest), Nurse McDonald acted only under his instructions. Dr. Carr continued to attempt a vaginal delivery of Taylor. He placed Ms. Long in the lithotomy position (with her legs in stirrups) at 8:47 a.m. At 8:50 a.m., Dr. Carr ordered first Nurse McDonald and then two male physicians to apply fundal pressure.[3]

At 8:53, the fetal heart rate dropped, then it recovered at 8:54, and then dropped again at 8:55. Dr. Carr continued to order Ms. Long to push during this time. After 8:55 a.m., the fetal heart rate continued to decline. At 9:00 a.m., Dr. Carr began using a vacuum extractor to attempt to remove the baby. At approximately 9:07 a.m., he ceased using the vacuum extractor and began using forceps. Dr. Carr's use of forceps was unsuccesful, and by 9:10 a.m., he had arranged for the operating room to prepare for an emergency cesarean section. Taylor's fetal heart rate continued to drop.

**3.** "Fundal pressure" is pressure applied to the outside of the mother's abdomen to push out the baby.

The emergency cesarean section was performed between 9:15 a.m. and 9:21 a.m., approximately 40 minutes after Taylor first showed signs of reduced heart rate. She was not breathing when she was born. Her first breath occurred 19 minutes after her birth. Taylor's birth certificate stated that she suffered from the abnormal conditions of "meconium aspiration syndrome" and "bradycardia."

Immediately following her birth, Taylor was taken by helicopter to St. Louis Children's Hospital in St. Louis, Missouri, where she remained for approximately six weeks. Taylor had to use a ventilator to breathe, a tube in her nose to eat, and a catheter to dispose of her wastes. Although she was able to return home, she required 24–hour nursing care. At the time of trial, she was still fed by tube, her temperature had to be monitored hourly, she required frequent suctioning, and she received daily physical therapy. She also required medication to control her seizures and relax her stiffness. She was admitted to the hospital at least six times since her initial hospitalization.

At trial, Plaintiffs presented Dr. Barry Schiffrin and Nurse Donna Stephens to testify on the standard of care. Neither Dr. Schiffrin nor Nurse Stephens criticized Nurse McDonald's actions prior to 8:28 a.m. Dr. Schiffrin opined that Nurse McDonald should have notified Dr. Carr promptly when the fetal heart rate dropped at 8:28 a.m. Dr. Schiffrin thought that, in response to the reduced fetal heart rate, Nurse McDonald should have turned Ms. Long on her side, provided oxygen, and moderated the amount of pushing. Nurse Stephens testified that at 8:28 a.m., Nurse McDonald should have turned Ms. Long on her side, and if that did not create an improvement in the fetal heart rate, Nurse McDonald should have increased Ms. Long's fluids, put her on oxygen, and immediately called for the doctor.

Defendant's expert, Nurse Gayla Wayman, also recommended administering fluids and oxygen and repositioning the mother. She testified that the fetal monitor strips reflected that Nurse McDonald did reposition the patient, and that shifting the hip would be adequate. Nurse Wayman did not criticize Nurse McDonald's care, and stated that "without exception, she did a very good job." Defendant's expert, Dr. Bruce Bryan, also testified that Nurse McDonald met the requisite standard of care.

On cross-examination, Dr. Schiffrin was asked whether Taylor would have been born without injury at various times between 8:25 and 8:50 a.m.

Q: If he had performed the C-section or ordered one at 8:25 and performed it, would the fundal pressure issue be eliminated?

A: Yes, and the pushing would have been eliminated and also the forceps and vacuum, and I believe the baby would have been born intact.

Q: How about the same thing at 8:40?

A: We are getting closer, but I still think—on the basis of variability that I thought the baby was intact, recoverable at 8:40. I do not believe, but don't know with a hundred percent certainty, I do not believe the baby [sic] yet injured at 8:40, but it is obviously in significant stress at this point.

. . . .

Q: Do you believe the baby still would have been born without problems [at 8:47 or 8:50]?

A: As. I said, there is a fair chance that it would not have been born without problems . . . I am trying to agree that I think before 8:50, I think, I really only want to go to 8:45, the longer you go after 8:45, the less reasonable I think is recovery. The answer is I don't know factually to the minute when it does. I believe 8:45 is really where I want to say I think the baby is still recoverable. After 8:45 it is not clear to me. It is less recoverable after 8:45 than it was before 8:45.

Plaintiffs' expert Dr. Arthur Prensky testified that the injury occurred within an hour or so of birth, which would have been between 8:21 and 9:21 a.m.

Although the experts agree that a lack of oxygen and an interruption of blood flow to the brain caused Taylor's injuries, they disagree about what caused those conditions. Plaintiffs' expert Dr. Schiffrin believed a combination of events during the attempted delivery caused the lack of oxygen and interruption of blood flow. On cross-examination, Dr. Schiffrin stated, "I believe … it is not possible to separate out complete [sic] the very frequent contractions, the pushing, the fundal pressure and then the later application [of the forceps and vacuum extractor] before they tried to do a [cesarean] section."

Defendant's counsel read excerpts from the depositions of three of Defendant's expert witnesses. Defendant's expert, Dr. John McDonald, said Taylor suffered from a "prolonged partial asphyxiation" caused by a uteral placenta insufficiency occurring one to three days prior to birth, rather than an acute event during labor or delivery. Dr. Elias Chalhub said Taylor's injury occurred one to two days before birth due to "cord compromise, cord prolapse infarction of the umbilical cord, or pressure on the vena cava by the mother." Dr. Harry Farb said Taylor suffered from viral meningitis five to thirteen weeks prior to birth. At trial, Defendant's expert Dr. Bruce Bryan only testified as to whether Taylor was acidotic, i.e., had a build-up of metabolic acids caused by an improper blood flow. A baby that is acidotic may suffer from inadequate oxygenation. In Dr. Bryan's opinion, Taylor became acidotic between 8:55 a.m. and 9:21 a.m.

Plaintiffs' life expectancy expert, Dr. Arthur Prensky, testified that the normal life expectancy of a female is seventy-seven years. The court initially permitted Dr. Prensky to testify over Defendant's objection that Taylor had "about a fifty/fifty chance of living about fifteen more years." Dr. Prensky said his opinion was based "primarily" on literature, not his personal experience, and admitted that literature written by a Dr. Iman [phonetic spelling] would only support a five-year life expectancy.[4]

Taylor's father, Pat Thompson, testified that Taylor's pediatrician, Dr. Karen Wickline, gave Taylor a three-year life expectancy. In deposition, Defendant's expert Dr. John McDonald believed Taylor would have a life expectancy of "five or six more years, not a decade." Dr. McDonald testified that the life expectancy of children with cerebral palsy differs depending on the child's mobility, quality of care, and respiratory status. He testified that he had some cerebral palsy patients who lived into their late teens.

The court permitted Dr. Harold Goldstein, Professor of Medical Economics at Northwestern University, to testify for the Plaintiffs regarding future damages, denying Defendant's motion to bar Dr. Goldstein's testimony as inadmissible under § 490.065, RSMo 1994. To calculate Taylor's future damages, Dr. Goldstein increased the current dollar value of medical expenses that he anticipated Taylor would need by 3.29 percent, and then reduced that figure by 1.64 percent to discount it to current value. His estimate of Taylor's future medical expenses were based upon his review of Taylor's medical records and bills and conversations he had with her treating nurses and her parents.

Dr. Goldstein calculated Taylor's future damages for a fifteen-year period. He testified that, through age fifteen, Taylor's medical expenses would include $5,698.00 for visits to pediatricians, $3,324.00 for visits to neurologists, $1,108.00 for ENT visits, $15,000.00 for equipment, $30,394.00 for medication, $132,976.00 for hospitalizations, and $3,466.881.00 for 24–hour nursing care, for a total of $3,655.383.00. He

---

**4.** The testimony of Dr. Prensky regarding the "fifty/fifty chance of living about fifteen more years" was later the subject of a withdrawal instruction.

reduced that total to $3,367.838.00, as a year had passed between his preparation of the report and trial, but noted that her actual expenses would be "significantly higher." Defendant's counsel made a continuing objection to Dr. Goldstein's testimony "for lack of foundation in regard to the categories and what Taylor may really need and not need," which the court overruled.

After Plaintiffs' counsel concluded their direct examination of Dr. Goldstein, Defendant's counsel requested a discussion outside the hearing of the jury, and argued that Dr. Goldstein had changed his testimony subsequent to his deposition without notice to Defendant. In addition to subtracting the costs for the year prior to trial, Dr. Goldstein also cut out "a number of items [of medical equipment] that the testimony didn't support she needed." The court then permitted Defendant's counsel to cross-examine Dr. Goldstein "and ask him anything you want about the numbers." Defendant's counsel asked Dr. Goldstein to provide calculations based on five- and three-year future life expectancies, as Dr. Goldstein had included in his initial report. Dr. Goldstein testified that it would take him "time to figure out" the damages for those time periods, but he volunteered "general numbers" for those periods of $1,712,798.00 for five years and $478,499.00 for three years. Other facts will be mentioned in discussing Defedant's points relied on.

## II. POINTS RELIED ON

### A. Causation

For its first point, MDMC claims that the trial court should have granted its motion for a directed verdict and motion for judgment notwithstanding the verdict, because Plaintiffs failed to present sufficient, competent evidence of causation, as the evidence was insufficient to prove that any act or omission by Defendant's nurse employee McDonald constituted a "but/for" cause of Taylor's condition, or a proximate cause of Taylor's injuries.

In determining whether Plaintiffs made a submissible case, this court must consider the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiffs, disregarding all contrary evidence. *Stalcup v. Orthotic & Prosthetic Lab, Inc.*, 989 S.W.2d 654, 657 (Mo.App.1999). Under the "but/for" causation test, defendant's conduct is the cause of the injuries if they would not have occurred but for that conduct. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860–61 (Mo. banc 1993).

Proximate cause occurs if the cause operates to produce a particular consequence without the intervention of an independent or superceding cause. *McCutcheon v. Tri–County Group XV, Inc.*, 920 S.W.2d 627, 632 (Mo.App.1996). Negligence of the defendant need not be the sole cause of the injury but one of the efficient causes thereof without which the injury would not have occurred. *Crane v. Drake*, 961 S.W.2d 897, 902 (Mo.App.1998). Causation is for the trier-of-fact where reasonable minds could differ. *Linton v. Mo. Hwy. & Transp. Comm'n*, 980 S.W.2d 4, 9 (Mo.App.1998).

To support Defendant's argument that Nurse McDonald's actions or omissions were not a "but/for" cause of Taylor's injuries, it points to the testimony of Plaintiff's expert, Dr. Schiffrin. Dr. Schiffrin testified that Nurse McDonald failed to meet the standard of care by failing to call Dr. Carr at the first signs of fetal distress and failing to turn Ms. Long, and that those acts contributed to Taylor's injuries. He also testified that Taylor was not injured at 8:45 a.m. (the time at which Dr. Carr resumed care of Taylor), and may not have been injured at 8:50 a.m. And although Dr. Schiffrin testified that Taylor was "in significant stress" at 8:40 a.m., he also stated that at 8:40 a.m., "I think it is still recoverable, perhaps to 8:45. After 8:45 less and less and at some time it is going to be injured, but I don't know exactly." However, a witness for the Defendant, Dr.

Bryan, testified that it was "unlikely" that Taylor would have been in good health had she been born at 8:45 a.m.

Although Nurse McDonald assisted Dr. Carr after 8:45 a.m. in attempting the vaginal delivery of Taylor Thompson, she acted only under Dr. Carr's direction, not independently. Thus, Defendant argues, "[h]er liability for negligent care, as with any nurse, ends when the physician assumes control of his patient." Citing *Callahan, supra,* Defendant contends that because the injury occurred after Dr. Carr resumed Taylor's care, Nurse McDonald's actions are not a but-for cause of Taylor's injury, and therefore MDMC cannot be liable for negligence. Defendant asserts "[i]f the baby is still recoverable when Dr. Carr arrives, then no action or inaction of Nurse McDonald could be a 'but-for' cause of the injury."

To support Defendant's argument that Nurse McDonald's actions or omissions could not have been a proximate cause of Taylor's injuries, Defendant cites *Tompkins v. Cervantes,* 917 S.W.2d 186, 191 (Mo.App.1996), which states, "If a prior remote cause does nothing more than give rise to an occasion by which an injury is made possible, and then intervenes between that cause and the injury a distinct and unrelated cause of injury, a negligence action does not lie even though the 'but-for' test is satisfied." Because Dr. Carr may have delivered Taylor without injury despite any actions Nurse McDonald took before his arrival, Defendant argues that his actions or omissions were an independent, intervening cause, and therefore the sole proximate cause of Taylor's injuries. Defendant argues that, at worst, Nurse McDonald's actions or omissions created an "injury-producing condition" (bradycardia), not an injury.

■ Here, the jury was entitled, under the evidence, to determine causation. There was evidence that the nurse's actions contributed to cause Taylor's injuries, although all or part of them could have been reduced had the doctor proceeded promptly to a cesarean section. Taylor's injuries were caused by a prolonged lack of oxygen, which may be attributed, at least in part, to Nurse McDonald because she did not promptly ask Dr. Carr to return, did not ensure that Taylor's mother was wearing her oxygen mask, and did not turn Taylor's mother on her side. These omissions appear to be both a "but/for" and proximate cause of Taylor's injuries. *Cf. Callahan,* 863 S.W.2d at 862. Point I is denied.

*B. Error in giving Instruction No. 8, Plaintiffs' verdict-directing instruction.*

■ For its second point, Defendant MDMC contends that there was insufficient evidence to support Plaintiffs' verdict-directing instruction. Error regarding the giving of that instruction was not preserved because it was not set forth in full in the argument portion of the brief, as required by Rule 84.04(e). *Woodiel v. Barclay Enter., Inc.,* 858 S.W.2d 247, 253 (Mo.App.1993); *McMullin v. Borgers,* 806 S.W.2d 724, 727–28 (Mo.App.1991)(Rule 84.04 is to be strictly enforced); *Ferguson v. Overhead Door Co. of Springfield,* 549 S.W.2d 356, 362 (Mo.App.1977). Nevertheless, what we said in discussing the last point and in reviewing the record convinces us that the instruction was supported by the evidence. Point II is denied.

*C. Dr. Prensky's opinion on life expectancy*

For its third point, Defendant contends that the trial court erred in not ordering a new trial because the life-expectancy testimony of Dr. Prensky, "failed to comport with standard for admissibility for opinion evidence of a consequence more probable than not."

■ Dr. Prensky testified that Taylor had "about a fifty/fifty chance of living about fifteen more years." Assuming, but not deciding that this testimony was im-

proper, we conclude that the error, if any, was cured when the court gave the withdrawal instruction. Defendant argues that this withdrawal instruction must not have been sufficient, as the jury could not have found the damages it did unless it disregarded the instruction. However, we cannot draw the same conclusion, as there was evidence that in his practice Dr. McDonald had seen similar children with cerebral palsy live until their late teens.

■ We presume that the jury followed the court's withdrawal instruction. *Lohmann v. Norfolk & Western Ry. Co.*, 948 S.W.2d 659, 665 (Mo.App.1997). Courts also recognize that in extreme situations, a withdrawal instruction may not be adequate to overcome the effect of prejudicial material introduced in the case, if the circumstances in such a situation are exceptional. *Id.* Here, we do not see this testimony as being so prejudicial or exceptional that we can assume the jury ignored the instruction. Whatever prejudice, if any, regarding this evidence was nullified when there was other testimony indicating that such children may live beyond the time Dr. Prensky used. Point III is denied.

## D. Necessity and reasonableness of past and future medical expenses

For its fourth point, Defendant contends that the trial court erred in failing to grant a "partial judgment or new trial" pertaining to past and future medical expenses because Plaintiffs failed to present evidence of the necessity and reasonableness of those expenses.

■ Defendant cites several cases for the proposition that a plaintiff cannot recover damages on medical expenses unless he or she presents evidence of the reasonable necessity and value of the services. *See Rebound, Inc. v. Pugh*, 912 S.W.2d 660, 662 (Mo.App.1995); *Green v. Hastings*, 621 S.W.2d 549, 551 (Mo.App.1981); and *Brautigam v. Hoffman*, 444 S.W.2d 528, 534 (Mo.App.1969). Generally, the bills themselves are considered sufficient

evidence of the reasonable value and necessity for the services. *See generally, id.*

■ Defendant contends that the only evidence that plaintiff set forth regarding past medical expenses was a summary of medical bills attested to by Pat Thompson, Taylor's father. The medical bills were not admitted into evidence. The summary had a listing of forty-six charges totaling over $440,000.00.

Defendant cites *Lawton v. Jewish Hosp. of St. Louis*, 679 S.W.2d 370 (Mo.App. 1984), for the proposition that a summary of medical expenses is not sufficient evidence to prove the reasonable value of medical services. In *Lawton*, the court reversed and remanded the trial court's judgment for the plaintiff, because the only evidence of medical damages was a summary of special damages, and it was unclear whether the medical expenses included in the summary were for the injury at issue or other medical problems. *Id.* at 373. The bills, even though "minimal," were not admitted into evidence. *Id.* at 374.

*Lawton* noted that "where complicated or detailed lengthy records [a]re at issue," the court may allow "the substitution of a summary for the original bills." *Id.* at 374. Without viewing the bills themselves, it is impossible to determine whether they were complicated or detailed and lengthy. However, given Taylor's condition, they presumably were numerous, and there is no question that all of her medical expenses stem from her injuries at birth. While a summary is not the "best evidence" of Taylor's medical expenses, the substitution of the summary was not an abuse of discretion in this case.

Defendant also contends that the medical expenses included in Pat Thompson's summary, which Pat Thompson said at trial had already been paid "to the best of my knowledge," were not actually paid until after trial, at a discount. Defendant suggests that this makes the summary inaccurate, and therefore inadequate evi-

dence of the reasonable value of the past expenses. The record does not support Defendant's assertions that the bills were not paid.

In Defendant's brief, it states that "those bills were actually paid **after** trial and with a discount," and cites page 21 of one of the transcripts. On that page is a reference to payment of a Medicaid lien. Also in Defendant's brief is a reference to a "negotiated compromise ... on one bill" to be paid after trial. Page 8 of the same transcript was cited. At that page is a reference to a Medicaid lien. There was no reference on either page to any of the charges listed on the summary of medical bills. If anything, these pages support the testimony that the charges listed were paid although perhaps by a third party.

■■■■ Of course, recovery for medical expenses depends upon proof of the necessity and reasonableness of those expenses. *Williams v. Jacobs.* There must be substantial evidence that the charges were reasonable and represent services that were reasonably necessary to treat, alleviate, or cure injuries sustained as a result of the incident. *Id.* Evidence of payment leads to a presumption that if the charges were not reasonable they would not have been paid. That the medical treatment was necessary can be supported by inference from the injury. *Id.* Here, the extensive injury and evidence of necessary treatment justified the jury's finding that the charges were necessary and represented services reasonably necessary for the child's treatment.

■■■ Finally, Defendant argues that plaintiff's testimony on the necessity of future medical expenses given by Dr. Goldstein, an economist, was insufficient to establish "to a reasonable degree of medical certainty that the injury caused through the alleged negligence required the medical care rendered to the patient." Defendant suggests that a medical expert's testimony would be required to show the reasonable necessity of future medical ex-

penses. We disagree. Dr. Goldstein based his estimates of Taylor's future medical expenses on her previous medical records, medical bills, and interviews with her treating nurses and parents. While he may have presented the "worst case scenario," and thus the necessity of some of his estimated expenses may be questionable, absolute certainty in predicting future damages is not required. *See Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 210 (Mo. banc 1991).

Point IV is denied.

## E. Juror Misconduct

For Defendant's fifth point, it asserts that the court erred in failing to grant a new trial because of juror misconduct. Defendant contends that juror Donald Carr failed to disclose past business dealings with Defendant. The facts pertaining to this prior relationship follow.

MDMC requested bids for installation of a roof on MDMC's purchasing and warehouse building. MDMC awarded the job to Carr Roofing and Sheet Metal Co., of Sikeston. Carr Roofing was owned by Floyd Carr, Donald Carr's brother. The bid, dated March 15, 1994, promised a ten-year warranty on a rubber roof, or a five-year warranty on an asphalt and fiberglass roof. Apparently the hospital accepted Carr Roofing Co.'s bid for the asphalt and fiberglass roof with a five-year warranty. In late 1996 or early 1997, Bob Stinnett, plant superintendent for MDMC, contacted Carr Roofing Co. to complain that the roof was leaking and the sticky material used made servicing air handler units on the roof difficult. At that time, Donald Carr was running Carr Roofing Co. His brother, Floyd Carr, was deceased.

MDMC asked Donald Carr to repair the roof pursuant to the warranty. A letter was sent to Carr by Hux & Hux, attorneys for MDMC. Carr met with Stinnett and Charles White, director of purchasing for MDMC, to discuss the repairs, and Carr promised he would fix it. At a post-trial hearing on the matter, Stinnett said that

Carr sent someone to place runners on the roof so that the air handler units would be more accessible, but Stinnett and White both claimed that the roof still leaked. Stinnett testified at the hearing that he had his secretary leave several messages with Carr Roofing to repair the leaks, but Carr did not return the calls. In an affidavit Carr filed with the court, Carr claims that he honored the warranty and repaired the roof.

The trial commenced in January of 1999. On voir dire, counsel for MDMC asked, "Does anybody here on the panel or any member of your immediate family have a business relationship with the hospital ... ?", "Anybody else ... have any bad experience with a hospital?", and "[I]s there anybody here who feels for whatever reason, any reason whatever, you don't think you could be fair and impartial to the hospital?" Carr did not respond to any of these inquiries. Carr also failed to respond when the jurors were asked if any of them had prior involvement in litigation, although he had answered a similar question affirmatively on the juror questionnaire. Defendant argues that this information is material and that Carr should have disclosed it during voir dire.

■ Defendant is correct that intentional concealment by a juror may require the grant of a new trial. See *Brines v. Cibis*, 882 S.W.2d 138, 140 (Mo.banc 1994). However, here, the attorneys did not ask any specific questions regarding past dealings with the Defendant that Carr would have been required to answer. For example, there were no questions about prior business dealings with Defendant. Taken in context, the "bad experience" question related to health care, not business relationships.

■ Failure to disclose prior litigation on voir dire is considered "material" because a venireperson's past experience as a plaintiff or defendant creates a possibility of predisposition. *Id.* at 140. However, a litigant who learns of the nondisclosure or has privy to the undisclosed information must challenge the juror at the time he learns of the nondisclosure or the right to complain is waived. *Id.* Defendant's attorneys had the answers to the jury questionnaire prior to voir dire. They could have specifically inquired into Carr's prior litigation but neglected to do so. Thus, they have waived their right to now complain.

■ It is for the trial court to determine whether nondisclosure was intentional or unintentional, and an appellate court should not disturb that ruling absent an abuse of discretion. *Williams v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo.banc 1987). Here, if we were to decide this issue according to Defendant's view, we would be second-guessing the trial court, which found no juror misconduct. We decline to do so. Point V is denied.

F. *Admissibility of Dr. Goldstein's testimony*

In its sixth point, Defendant claims that the trial court should have granted a new trial because Dr. Goldstein's opinion testimony failed to comply with § 490.065, RSMo, lacked foundation, and constituted surprise. Dr. Goldstein testified as an expert in "future damages methodology" and gave his opinion on what Taylor's future damages would be over the life expectancy testified to by Dr. Prensky. On cross-examination, Dr. Goldstein also provided estimated future damages calculations for five-year and three-year periods.

■ The admission of expert testimony is within the discretion of the trial court. *Estate of Dean*, 967 S.W.2d 219, 224 (Mo.App.1998). "The admission of improper evidence is a basis for reversal when the evidence either prejudices the appellant or adversely affects the jury in reaching its verdict." *Babb v. Pfuehler*, 944 S.W.2d 331, 336 (Mo.App.1997). The standard for the admissibility of expert opinion testimony is set forth in § 490.065.3, RSMo 1994, which provides

that "[t]he facts or data in a particular case upon which an expert bases an opinion or inference ... must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable."

Defendant also points to the standards established in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923) (expert opinion requires general acceptance in its field to be admissible) and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (court considers several factors in assessing the admissibility of expert testimony, including the general acceptance of the expert's theory or techniques, whether the expert's theory has been subjected to peer review or publication in scientific journals, whether the theory has or can be tested, and whether the error rate for the expert's theory is acceptable).

Missouri has generally followed the *Frye* test for the admissibility of new scientific techniques. *See State v. Davis*, 814 S.W.2d 593, 600 (Mo.banc 1991), and *Alsbach v. Bader*, 700 S.W.2d 823, 828 (Mo. banc 1985). The *Frye* standard was modified by the Missouri Supreme Court in *State v. Biddle*, 599 S.W.2d 182, 191 (Mo. 1980), which stated that for scientific evidence to be admitted, "wide scientific approval" of the reliability of the scientific techniques employed is required.

The U.S. Supreme Court rejected *Frye* in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court based its decision on its interpretation of Rule 702 of the Federal Rules of Evidence.[5] *Daubert*, 509 U.S. at 593, n. 11, 113 S.Ct. 2786. Recent-

ly, the U.S. Supreme Court held that *Daubert* applies to all expert testimony based on scientific, technical, or other specialized principles, not just testimony derived from novel scientific evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999). This standard was held applicable to economic methods in *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 34 n. 12 (1st Cir.1999), which stated that "[t]he district court's gatekeeping function extends to all expert evidence, including economic analysis, not merely to evidence involving scientific conclusions."

Section 490.065, RSMo, applicable to civil cases, is modeled after Rule 702. Thus, its adoption may create the question if Missouri courts should continue to apply the *Frye* standard to the admissibility of expert testimony, or if *Daubert* would be more appropriate. Although there seems to be a consensus among appellate courts that "[t]he Missouri Supreme Court continues to apply the *Frye* test to the admissibility of expert testimony," "*Frye* requires only that expert testimony be based on scientific principles generally accepted in the relevant scientific community." *M.C. v. Yeargin*, 11 S.W.3d 604, 619 (Mo. App.1999). While there has been some confusion on the issue, *Frye* generally is not considered to be applicable when the testimony sought to be admitted does not involve scientific techniques. *Compare Schumann v. Mo. Highway & Transp. Comm'n*, 912 S.W.2d 548, 554 n. 8 (Mo. App.1995)(court considered whether an economist's testimony regarding hedonic damages should have been admitted under the standards established in *Frye, Daubert*, and § 490.065) *with Hobbs v. Harken*,

**5.** Fed.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the experts at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

969 S.W.2d 318, 321 (Mo.App.1998)(court reversed the trial court's admission of an economist's testimony regarding future income loss under § 490.065.3, RSMo, without discussing if *Frye* or *Daubert* applied.)

No Missouri appellate court has considered since the U.S. Supreme Court's decision in *Kumho* whether to apply the *Daubert* multi-factor test to non-scientific evidence. However, it seems apparent that applying *Frye* to scientific evidence and *Daubert* to non-scientific evidence would only create more confusion for trial judges in determining whether to admit expert testimony. Until the Missouri Supreme Court dictates otherwise, we think the admissibility of expert testimony regarding non-scientific evidence can be assessed under § 490.065, RSMo, without applying any of the *Daubert* factors.

Dr. Goldstein is a professor at Northeastern University, specializing in "medical economics." He has published six book chapters, three books, and approximately 130 articles in professional journals discussing his work in medical economics. He has prepared "thousands" of life-care plans to calculate the present-day costs of disabled children's future anticipated medical care.

Defendant argues that Dr. Goldstein's future damages methodology is "pure 'junk' science designed solely for use in litigation" and is not generally accepted by other economists in his field. Dr. Goldstein admitted that three-quarters of his income comes from work with attorneys on personal injury cases. Dr. Goldstein also admitted that his theories have never been subjected to peer review by economists and have never been tested, reviewed, or validated by other economists, scientists, or computer programmers.

To support Defendant's contention that Dr. Goldstein's testimony was not reliable, Defendant points to the decision of the United States Claim Court in *Johnston v. Sec'y of Dep't of Health and Human Services*, 1990 WL 299393 (Cl.Ct.1990), in which the court rejected Dr. Goldstein's

methodology and adopted an alternative approach in calculating the future medical expenses for a child who suffered a brain injury. There, Dr. Goldstein applied the same methodology, using the same growth and discount rates, as he used in the present case.

In his testimony in the present case, Dr. Goldstein defended his methodology, stating,

Who knows what other economists use. They could use anything they wish, but what is important is what spread they come out with. My spread is 3.29 percent growth rate, and 1.64 percent discount. [The] spread is 1.65, the difference between the two, and there are I know of at least a dozen different economists that would come up with a spread of 1.65. They use this spread for lost earning capacity, but most all of the monies we are going to talk about for Taylor are not lost earning capacity, they are for future medicals, and the medical care has gone up at a higher rate than anything else in the United States over the last fifty years.

We do not think the trial court erred in finding that Dr. Goldstein's testimony met the requirements of § 490.065, RSMo 1994, that his opinions be based on facts or data "of a type reasonably relied upon by experts in the field" and otherwise be "reasonably reliable." As earlier noted, absolute certainty in predicting future damages is not required. *See Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 210 (Mo.banc 1991). Although Dr. Goldstein's testimony was severely criticized in *Johnston* and by Defendant, he and his theories were subject to extensive cross-examination. *Johnston* is not controlling on this Court and we cannot conclude, as a matter of law, that Dr. Goldstein's calculations were incorrect. The jury, as the trier-of-fact, could decide if the testimony was credible and the weight to be given to it.

The trial court did not abuse its discretion in permitting Dr. Goldstein's testimony.

■ Defendant complains that "Dr. Goldstein was permitted to testify at trial regarding his opinion of the future medical expenses of Taylor Thompson for 15 additional years of life" over Defendant's "continuing objection as to lack of foundation based on the inadmissibility of Dr. Prensky's evidence of a 15–year life expectancy," citing *Hobbs v. Harken*, 969 S.W.2d 318 (Mo.App.1998)(which ruled that it was error for the court to admit evidence on future lost wages based on an unsupported assumption that the plaintiff's injuries "would continue unabated for twenty years"). The trial court gave a withdrawal instruction ordering the jury to not consider Dr. Goldstein's "opinion of future medical damages for 15 years." We presume that the jury followed the withdrawal instruction. *See Lohmann*, 948 S.W.2d at 665.

■ Defendant also contends that it was not notified that Dr. Goldstein's testimony at trial would differ from that in his deposition, so that his testimony at trial constituted unfair surprise. Defendant had requested that Plaintiff inform him of any changes in Dr. Goldstein's testimony, and made a motion *in limine* to exclude from evidence any expert testimony that differed from that given in depositions. The trial court sustained MDMC's motion, but overruled MDMC's objection at trial to Dr. Goldstein's changed testimony because his testimony resulted in a reduction of estimated future damages. Thus, the trial court stated that the changed testimony did not prejudice MDMC. Defendant argues that it was prejudiced in that it was unable to anticipate or prepare for the answers received on cross-examination, citing *Gassen v. Woy*, 785 S.W.2d 601, 604 (Mo.App.1990)(duty of parties to inform other side of anticipated change in expert testimony), and *Ellis v. Union Elec. Co.*, 729 S.W.2d 71, 75 (Mo.App.1987)(prejudice inferred from the change in expert testimony unless under the circumstances of

the case the inference is dissipated) as support. However, as the court in *Gassen* noted, at 604:

> A trial court is vested with broad discretion as to its choice of a course of action during trial when the introduction of evidence is challenged on the ground that it has not been disclosed in response to appropriate discovery. In the sound exercise of that discretion it may admit or reject such evidence or determine and impose other appropriate sanctions.
>
> . . . .
>
> Certainly, the arbitrary exclusion of all evidence in such cases is not the only option available to the trial court, although that sanction is open. The very nature of the discretion vested in the trial court recognizes that each case must be determined on its own peculiar facts which bear on the question of whether that discretion has been abused.

(Citations omitted.)

The trial court determined that the changed testimony did not prejudice Defendant and that determination was reasonable. The court was not required to exclude the testimony. Point VI is denied.

### G. Multiple demonstrations of Taylor's condition prejudicial

Defendant's seventh point alleges that the trial court should have granted a new trial because "Plaintiff's evidence of Taylor Thompson's current condition was inflammatory and prejudicial as shown through 'A Day in the Life Film of Taylor Thompson' … twenty photographs shown to the jury … and Taylor Thompson's presence in the courtroom." Defendant asserts that "[w]hile any one of these means would have been sufficient or adequate for whatever minimal legal relevance Taylor Thompson's condition had to the issues at

**645**

trial, ... utilizing all three was prejudicial and inflammatory." [6]

▮ Again, the trial court has discretion in determining whether to admit evidence, and the admission of improper evidence is only a basis for reversal if the evidence prejudices the appellant or adversely affects the jury in reaching its verdict. *Babb v. Pfuehler*, 944 S.W.2d 331, 336 (Mo.App.1997). "The issue presented in admitting or rejecting a 'Day In The Life' videotape is whether it is practical, instructive and calculated to assist the jury in understanding the case. The trial court's ruling regarding the admissibility of such videotapes is accorded great weight and will not be disturbed on appeal absent an abuse of discretion." *Repple v. Barnes Hosp.*, 778 S.W.2d 819 (Mo.App. 1989) (citations omitted).

In *Haley v. Byers Transp. Co.*, 414 S.W.2d 777, 780 (Mo.1967), the Supreme Court upheld the trial court's exclusion of a day-in-the-life video of the paraplegic plaintiff, concluding that the video was self-serving, constituted testimony from a party not subject to cross-examination, and created sympathy for the plaintiff out of proportion to the real relevancy of the evidence. The Court noted that descriptions of plaintiff's activities were already in evidence and that plaintiff could have offered his equipment as an exhibit if he thought more detail was required. *Haley*, 414 S.W.2d 777, 780 (Mo.1967).

In *Helm v. Wismar*, 820 S.W.2d 495, 497 (Mo.banc 1991), the Supreme Court again upheld a trial court's exclusion of a day-in-the-life videotape because the plaintiff "was present in court for the jury's observation."

In *Repple, supra*, the Court of Appeals upheld the trial court's exclusion of a day-in-the-life video, noting that "plaintiff appeared at trial and was able, with the aid of several appliances and medical devices, to demonstrate her daily living activities to

the jury through the use of conventional testimony." *Repple*, 778 S.W.2d at 823.

In *Lawton, supra*, the Court of Appeals upheld the trial court's admission of a day-in-the-life videotape, noting that "[t]he videotape provided information essential to a fair jury determination because respondent's ill health prevented his appearance in the courtroom." *Lawton*, 679 S.W.2d at 372.

▮ In the above cases, the reviewing courts upheld the trial courts' decisions regarding the admissibility of the videotapes. In the present case, the trial court admitted the videotape. Defendant argues that it should not have, because other evidence of Taylor's condition was presented at trial, and the cumulative effect of permitting the multiple displays of Taylor's condition was prejudicial.

We find no abuse of discretion. The child's brief presence in the courtroom could not illustrate the care she required as well as the video and the photographs could. We believe that the video and the photographs may well have aided the jury in determining the issues presented as to past and future care and medical expenses. Point VII is denied.

### H. Payment of attorneys' fees upon judgment

▮ For its eighth point, Defendant contends that "[t]he trial court erred in ordering attorneys' fees under section 538.220, R.S.Mo. to be paid upon judgment in that the trial court failed to consider the amount of damages recovered in settlement with Dr. Carr and failed to consider and hold Plaintiffs to their evidence of future life expectancy."

Section 538.220.2, RSMo 1994 provides:

At the request of any party to such action made prior to the entry of judgment, the court shall include in the judgment a requirement that future damages

---

6. Taylor was only in the courtroom for a brief time, to demonstrate her condition. She did not remain in the courtroom throughout the trial.

be paid in whole or in part in periodic or installment payments if the total award of damages in the action exceeds one hundred thousand dollars.

Section 538.220.4 presumes that if the plaintiff and plaintiff's attorney have a contingency fee agreement, "the fee will be paid at the time the judgment becomes final." A federal court interpreting the statute opined, "The statute makes clear that funds for payment of attorney's fees [on the total judgment] must be available from the initial payment and should not, as suggested by defendant, be paid over time, even though the future damages are paid over time." *Roesch v. Ryan,* 841 F.Supp. 288, 292 (E.D.Mo.1993). Both *Roesch* and *Baker v. Guzon,* 950 S.W.2d 635, 648 (Mo. App.1997), upheld trial court orders which deducted attorneys' fees from the future damages award before ordering periodic payments.

The trial court entered judgment ordering that Defendant make a lump payment for future damages upon entry of judgment of $1,015,855 .65, with the remainder of future damages to be paid in ten yearly installments of $102,664.43. The settlement with Dr. Carr (for $950,000.00), approved by the court, provided for the payment of $380,000.00 in attorneys' fees and $75,200.07 in expenses.

In a hearing on the Plaintiffs' motion for entry of judgment, held February 17, 1999, Defendant's counsel argued that the attorneys' fees should be paid in installments and that paying them up front could result in the Plaintiffs losing their recovery if Taylor were to die soon after entry of judgment. In response, the trial judge stated, "I am going to apply the statute, and the statute says you have to pay them up front plus the past non-economic damages and past damages." The trial judge then concluded, "The only thing I'm sure about at this point is I have to take the attorney fees out of it before we start figuring the rest of it, so that ... plus the past damages would be the initial payments upon entry of judgment."

The Supreme Court has stated: "The language of § 538.220.2 is a general grant of equity powers to the circuit court. The circuit court is, thus, entitled to fashion relief in the best interests of the parties, subject to review only on the basis of its arbitrariness." *Vincent v. Johnson,* 833 S.W.2d 859, 866 (Mo.banc.1992). In that case, the Court noted two exceptions to the trial court's discretion under § 538.220 RSMo, "First, all past damages must be paid in a lump sum at the time of judgment. *§ 538.220.1.* Second, it is presumed that, absent the attorney's agreement, attorney's contingent fees will be paid at the time of judgment. *§ 538.220.4." Id.*

Defendant argues that requiring the attorneys' fees be paid out of the initial lump payment created an unjust result, in that attorneys' fees could be paid based on future damage awards that never will be received under § 538.220.5.

Section 538.220.5, RSMo 1994 states in part:

Payment of future medical damages will continue to the estate of the judgment creditor only for as long as necessary to enable the estate to satisfy medical expenses of the judgment creditor that were due and owing at the time of death, which resulted directly from the injury for which damages were awarded, and do not exceed the dollar amount of the total payments for such future medical damages outstanding at the time of death.

The trial court properly interpreted the statute in determining that attorneys' fees are to be paid when the judgment becomes final. Of course, most of the legal work had been done at that time. In oral argument, Defendant contended that a judgment is not final as long as it is pending in the courts. However, that runs contrary to Rule 81.05 that provides when judgments become final. The trial court appears to have considered the effect of the settlement and the evidence. Point VIII is denied.

*I. Remittitur of jury's award*

In Defendant's ninth point, it argues that the trial court abused its discretion when it refused to order a remittitur. Defendant asserts that remittitur is mandated because an excessive award for medical expenses and future damages resulted from the court's error in admitting Dr. Goldstein's testimony of future medical expenses based on a fifteen-year life expectancy. Plaintiffs argue that "the jury's award is well within the range of verdicts that other juries have reached in other cases involving catastrophic injuries." In the cases Plaintiffs cite, *Callahan, supra,* and *Firestone v. Crown Ctr. Redevelopment Corp.,* 693 S.W.2d 99 (Mo.banc 1985), awards of and in excess of $15 million were upheld, but the future life expectancy of the injured parties were arguably greater as well. *Firestone* was the case that abrogated remittitur, which the legislature later reinstated, so whether that case is an example of when remittitur is inappropriate is questionable.

Remittitur is governed by § 537.068, RSMo 1994, which provides that "[a] court may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages."

*Hatch v. V.P. Fair Found., Inc.,* 990 S.W.2d 126, 141 (Mo.App.1999) states:

Although the trial court has broad discretion in ordering a remittitur, the assessment of damages is primarily the function of the jury. We will not disturb the trial court's decision whether or not to reduce damages absent an abuse of discretion so grossly excessive that it shocks the conscience and convinces this Court that both the trial judge and the jury have abused their discretion. In reviewing whether a verdict is excessive, our review is limited to the evidence supporting the verdict.

There is no precise formula for determining whether a verdict is excessive, and each case must be considered on its own facts with the ultimate test being what fairly and reasonably compensates plaintiff for the injuries sustained.... [S]everal factors to assist in the determination of whether an award is excessive ... include: (1) present and future loss of income, (2) medical expenses, (3) plaintiff's age, (4) the nature and severity of the injuries, (5) economic factors, (6) awards given in similar cases, and (7) the superior opportunity of the trial court and jury to appraise plaintiff's injuries and other damages.

(Citations omitted.)

 Under the evidence before us, we cannot say that the verdict was excessive. The trial judge and the jury were in a better position to make the determination as to the proper compensation and the verdict here does not shock the conscience of the judges reviewing this matter. Point IX is denied.

*J. Plaintiffs' closing argument*

In Defendant's tenth point, Defendant alleges that the trial court committed error constituting an abuse of discretion by allowing Plaintiffs' counsel to argue in closing that the jury was permitted to speculate on Taylor's life expectancy, by telling the jurors they could consider Dr. Prensky's opinion that Taylor had a fifteen-year life expectancy and Dr. McDonald's comment that he had treated children with cerebral palsy who lived into their late teens. Prior to closing argument, the court gave a withdrawal instruction ordering the jurors to ignore Dr. Prensky's testimony concerning a fifteen-year life expectancy.

Defendant asserts that the trial court's error was in overruling its objection to Plaintiffs' counsel's closing argument informing the jury that they could speculate on the future life expectancy of Taylor Thompson. We find no ruling by the trial court on that objection. Defendant con-

tends that that ruling occurred on transcript page 863, and we set forth that page marginally.[7]

■ This Court does not consider a point upon which no ruling has been made, as lack of a specific ruling preserves nothing for review. *Vandever v. Junior College Dist. of Metro. Kansas City,* 708 S.W.2d 711, 720 (Mo.App.1986). Point X is denied.

### K. Cumulative Error

For its remaining point, Defendant contends that the trial court erred in not granting a new trial "based on the cumulative effect of prejudicial admission of evidence, juror misconduct, improper argument, and the excessive verdict in that the cumulative effect of errors and prejudice resulted in an excessive verdict and fairness requires a new trial on this case." As we find no merit or prejudice as claimed in Defendant's earlier points, this point, of necessity, must fail. *See Szasz v. Tella,* 984 S.W.2d 129, 134 (Mo.App.1998). Point XI is denied.

### III. CONCLUSION

■ Defendant is correct that, because of the death of Taylor Thompson, payment of future medical damages will cease under § 538.220.5. Exactly when they should terminate cannot be determined from this record; therefore, the cause is remanded for the trial court to make the determination contemplated by § 538.220.5, RSMo 1994. The judgment is affirmed subject to

the trial court modifying it under § 538.220.5.

BARNEY, C.J., and CROW, J., concur.

7. THE COURT: For the record, this is CV397–700CC. The jury is still out of the room. Any additional comments or questions about the instructions before we bring the jury back in?

MR. HENNELLY: No, Your Honor. I have a motion for directed verdict at the close of the entire case as well as just the comment that if we're going to allow counsel to argue about years other than what the evidence shows with regard to damages or life expectancy, I would object to that and if the Court would want me to do so, I'll object during closing argument. However, if the Court also or opposing counsel will acknowledge it can be a stipulated objection running through that, I will not interrupt.

MR. GRAHAM: We can agree that that objection or any objection related to the substance of that damages argument can be continuing without the necessity of making it during the closing argument.

THE COURT: All right. Also Defendant's motion for judgment at the close of the evidence is overruled.